512-07/JJW

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Defendant
MAERSK LINE LIMITED
80 Pine Street
New York, New York 10005
(212) 425-1900

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

JOHN PADILLA,                                    Case No.: 1:07-CV-03638-PKL


                            Plaintiff,

        - against -                              **MEMORANDUM OF LAW
                                                 IN OPPOSITION TO MOTION
                                                 TO COMPEL PAYMENT OF
MAERSK LINE, LTD. and/or                         OVERTIME**
UNITED STATES,

                            Defendants.
-------------------------------------------------------x

## *I. Statement of Facts*

On October 30, 2006, Padilla was hired as a Chief Cook aboard the

MAERSK ARKANSAS.   On that day, Padilla and the Master of the MAERSK

ARKANSAS signed the Particulars of Engagement and Discharge at the Port of

Salalah which provided for wages of $101.73 per day in accordance with the

Standard Freightship Agreement monthly rate for Chief Cooks of $3,051.90 per

month divided by 30 days.   A few days after joining the ship, Padilla claims he

sustained an injury while performing his duties.

NYDOCS1/305682.1

Page 2

On November 6, 2006, at the same Port of Salalah, Padilla was discharged and repatriated and again signed the Particulars of Engagement and Discharge providing that wages would be paid at $101.73 per day.  After being repatriated, Padilla was paid unearned wages at the rate stipulated in the Standard Freightship Agreement and the Particulars of Engagement and Discharge, in addition to maintenance payments, from November 6, 2006, until February 26, 2007, when the voyage ended.  In accordance with Maersk's longstanding practices concerning the calculation of unearned wages, overtime payments were not included.

Despite being on board the MAERSK ARKANSAS for a total of seven days, Plaintiff brought the instant motion demanding overtime payments for approximately three and one-half months of time during which he performed no work aboard the vessel.  As fully set forth below, Plaintiff is not entitled to overtime payments and summary judgment must be denied as genuine issues of material fact exist.

## II. Summary Judgment is Inappropriate as There are Genuine Issues of Material Fact

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). All

2

NYDOCS1/305682.1

factual inferences are to be drawn in favor of the party against whom summary judgment is sought. *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989). Procedurally, the party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S., 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). Applying these rules, summary judgment is inappropriate as to the unearned wage claim in this case.

Even if Padilla is entitled to overtime pay, summary judgment must be denied since Padilla, as the moving party, can not prove each element of his claim. In the instant circumstances, Padilla can not prove how much overtime he would have earned. In *Griffin v. Oceanic Contractors, Inc.,* 664 F.2d 36 (5th Cir. 1981), reversed on other grounds, 458 U.S. 564 (1982), the court denied overtime pay because "the actual amount of overtime was uncertain, and hence any inclusion of such would have been purely speculative." Id. at 664 F.2d 40. Similarly, the court in *Keefe v. American Pac. S.S. Co.,* 110 F. Supp. 853 (S.D. Cal. 1953) denied overtime pay since "[Plaintiff] contracted for the base wages. Actual earning of overtime was an event which might or might not occur. It depended upon many contingencies." Id. at 110 F. Supp. 856. Under the same reasoning, Padilla's instant motion must be denied. As overtime was not guaranteed or required on the

NYDOCS1/305682.1

MAERSK ARKANSAS, Plaintiff cannot prove the amount of overtime he would have earned. During the deposition, Plaintiff admittedly testified that seamen can refuse overtime and that overtime cannot be performed "unless the Master approves it." (See Padilla Dep. at pgs. 87-91 attached hereto as Exhibit "1".)

Padilla, as the moving party, has failed to prove the absence of a genuine issue - the amount of overtime itself. At this juncture, the amount is disputed and highly speculative. As Plaintiff cannot prove how much overtime he would have earned, summary judgment must be denied.

### III.    *Padilla is Entitled to Unearned Wages as a Matter of Law But the Rate is a Matter of Contract*

The principle that a seaman can recover his unearned wages was declared long ago by the Supreme Court in the leading case of *The Osceola*, 189 U.S. 158 (1903). A shipowner's ancient duty to provide maintenance, cure, and unearned wages to the end of the voyage is imposed by the law itself as an obligation annexed to the employment; it exists regardless of any employment contract, including a collective bargaining agreement. See *Cortes v. Baltimore Insular Line, Inc.*, 287 U.S. 367, 371 (1932).

In the instant matter, Maersk does not dispute the fact that it was obligated to pay unearned wages to the Plaintiff. Unlike other shipowners, Maersk's

4

argument does not attempt to eliminate unearned wages altogether. On this seminal point, the case of *Lipscomb v. Foss Maritime Co.,* 83 F.3d 1106, 1109 (9th Cir. 1996), cited by the Plaintiff is distinguishable. Contrary to Maersk's argument, the shipowner in *Lipscomb* attempted to eliminate any entitlement to unearned wages. See *Lipscomb* at 83 F.3d 1108 ("[Shipowner's] argument would serve to eliminate unearned wages altogether—something clearly not contemplated by the CBA or permitted under the general maritime law.") As more fully set forth below, Maersk argues that Plaintiff's level of unearned wages is a matter of contract, established by the Standard Freightship Agreement as evidenced in the signed Particulars of Engagement and Discharge which do not abrogate Plaintiff's right to unearned wages.

### IV. The Standard Freightship Agreement Regulated Padilla's Right to Unearned Wages

Like the rate of maintenance, the level of unearned wages can be set by agreement. The overwhelming majority of the circuits have held that an incapacitated, unionized seaman was bound by the rate of maintenance prescribed in a collective bargaining agreement even where such rate was insufficient to provide for the seaman's food and lodging. See *Skowronek v. American S.S. Co.,* 505 F.3d 482 (6th Cir. 2007); *Ammar v. United States,* 342 F.3d 133 (2d Cir. 2003); *Frederick v. Kirby Tankships, Inc.,* 205 F.3d 1277, 1292 (11th Cir. 2000);

5

Page 6

*Baldassaro v. United States,* 64 F.3d 206, 212-213 (5th Cir. 1995); *Al-Zawkari v. American Steamship Co.,* 871 F.2d 585, 588 (6th Cir. 1989); *Macedo v. F/V PAUL & MICHELLE,* 868 F.2d 519, 522 (1st Cir. 1989); *Gardiner v. Sea-Land Service, Inc.,* 786 F.2d 943, 949-50 (9th Cir.) (*"Gardiner"*) cert. denied, 479 U.S. 924, 93 L. Ed. 2d 303, 1075 S.Ct. 331 (1986).

The seminal court of appeals decision on this issue is *Gardiner* in which the Ninth Circuit ruled that "the broad policies which undergird the labor laws, as well as the nature of the collective bargaining process, require nevertheless that the maintenance rate expressed in the collective bargaining agreement be enforced." Id. at 948. The court's opinion provides the collective bargaining process was so important to the industry that a collective bargaining agreement, although it could not properly eliminate all right to maintenance, may properly limit its amount. *Gardiner,* 786 F. 2d 943 at 948-49.

Here, the Plaintiff does not allege that the Standard Freightship Agreement as a whole is unfair or inadequate. Plaintiff also does not assert that his interests were not adequately represented in the negotiation process. Despite this, Plaintiff argues that the meaning of unearned wages is a legal one, and that the negotiated agreement should not control and the rate of wages set forth in the Particulars of Engagement and Discharge should be disregarded.

6

Page 7

In this regard, the Plaintiff has failed to meet his burden to produce any evidence that a bona fide negotiation did not take place, and that the agreement was unfair, or that he was not adequately represented.  See *Al-Zawkari*, 871 F.2d at 588 ("[W]hen a benefits package includes an express reference to a precise rate of maintenance, *it must be presumed that this rate was arrived by negotiation*.") (emphasis added).  The instant agreement here does not abrogate a maritime right. Rather, it recognizes the rate of unearned wages and seeks to preserve it as part of the overall negotiation process.

In *Espinel v. Royal Caribbean Cruises, Ltd.,* 253 F.3d 629 (11th Cir. 2001), the court held that the expectations of the collective bargaining agreement should be honored with respect to its sick wages provision, even though this provision may be inconsistent with general maritime law.  Id. at 632.  The appellate court recognized that such agreements typically represent "a series of trade-offs between an employer and employee [in furtherance of] a mutually satisfying agreement." Id. at 632.  The appellate court found "that the district court erred in not relying on the collective bargaining agreement to calculate the amount of unearned sick wages."  Id. at 632.  Here, the court should similarly look to the expectations under the Standard Freightship Agreement and the Particulars of Engagement and Discharge to determine Padilla's unearned wages.

NYDOCS1/305682.1

7

Page 8

Although not cited by the Plaintiff, the cases of *Flores v. Carnival Cruise Lines*, 47 F.3d 1120 (11th Cir. 1995) [1], and *Aksoy v. Apollo Ship Chandlers, Inc.*, 137 F.3d 1304 (11th Cir. 1998) are distinguishable decisions concerning tip-earning employees. In *Flores* and *Aksoy* the courts used average tip incomes as a measure of unearned wages because no collective bargaining agreement applied and no other method of calculation existed. The contract in *Aksoy* is distinguishable in that it did not establish a rate but rather only contained a minimum guarantee. The contract in *Flores* is distinguishable in that it only provided an estimate of expected tips based upon the customary tipping practices of passengers. Additionally, any reliance on the *Aksoy* decision is further misplaced since the court never addressed the modification by contract issue. See *Aksoy*, 137 F.3d 1304, 1306 ("We therefore need not decide whether the right to unearned wages may be modified by contract...")

Here, Plaintiff's compensation package was negotiated and the wage rate expressly set forth in the signed Particulars of Engagement and Discharge controls. More importantly, the *Flores* and *Aksoy* cases were also decided before the 11th Circuit adopted a view of the law that required it to rely on contractual modifications of maritime law. See *Frederick v. Kirby Tankships, Inc.*, 205 F.3d

---

[1] In *Flores* the shipowner argued it had no legal duty to pay seaman anything more than his $45-per-month salary as unearned wages despite the fact that the relevant agreement estimated tips as much as twenty times more than the seaman's salary.

8

Page 9

1277, 1291 (11th Cir. 2000) (Holding that where an agreement fixes a rate, the court should accept it as reasonable.)

The facts of this case are analogous to the more recent *Espinel* decision in which a written contract modified the general maritime law. Similar to the *Espinal* decision, in this case there was an express agreement setting forth a particular amount of wages. An arguable difference between this case and *Espinal* is that the Collective Bargaining Agreement here did not set the unearned wage rate. However, the Particulars of Engagement and Discharge signed by the seaman did set the rate. Moreover, as the declarations Carol Berger and Catherine O'Connell demonstrate, in the long history of the relationship with the union, unearned wages have always been straight time, unless a settlement was being negotiated with the seaman. See Berger declaration (Exhibit "2") and O'Connell declaration (Exhibit "3") which are attached hereto. The most favorable gloss to the Plaintiff on this evidence is that there is a question of fact whether the agreement between Maersk and Padilla set a contractual unearned wage rate. The most compelling argument is straight time is equal to unearned wages as a matter of law.

Plaintiff cites to *Lamont v. United States,* 613 F. Supp. 588 (S.D.N.Y. 1985) to support the contention that he is entitled to unperformed overtime payments. Notably, the *Lamont* defendant did not argue that the level of unearned wages was a matter of contract, established by an agreement which did not abrogate any right

9

to unearned wages.  As a result, the *Lamont* court concluded that the issue was "purely a question of law."   Id. at 589.    The *Lamont* decision is further distinguishable in that there was no evidence of the seaman agreeing to the wage rate.    Here, Padilla executed Particulars of Engagement and Discharge which expressly provided an amount of wages consistent with the Standard Freightship Agreement.   Accordingly, the instant dispute is a matter of contract rather than a pure question of law.   The *Lamont* case is further distinguishable in that the Defendant in that case stipulated to the amount of overtime Plaintiff could earn. There is no such stipulation here.   Here, Maersk disputes the alleged amount of overtime and further avers that summary judgment must be denied since Padilla can not prove how much overtime he would have earned.

It also appears that the *Lamont* court's decision was premised upon the historic belief that seamen are "wards of the court and special provisions [should be] made in admiralty for those who go down to the sea in ships." Id at 589.  In modern times, such is not the case.  See *Ammar v. United States,* 342 F.3d 133, 146 (2d Cir. 2003) providing:

> The modern reality is that most seamen are no longer
> 'friendless'; rather, they have gained strength through
> collectivity, and they are a well-organized work force with
> sophisticated leaders who constantly press for better
> working conditions, pay, and benefits, as well as increased
> job security.  *Thus, the need for judicial intervention to
> protect  seamen  has  been  substantially  lessened.*

Page 11

> Recognizing both the goal of providing protection for injured seamen and the importance of collective bargaining to industrial peace, we conclude that, in light of the reality of modern circumstances, the appropriate accommodation between federal maritime common law and federal common law for the enforcement of collective bargaining agreements is to allow unionized seamen to bargain for rights and privileges they prefer in exchange for limiting the per diem rate of maintenance.

*Ammar,* 342 F.3d 133, 146. (emphasis own).

While the duty to provide unearned wages cannot be entirely abrogated by contract, the maintenance and cure law provides that a seaman's right to this remedy can be modified and defined by contract. See *Dowdle v. Offshore Express, Inc.,* 809 F.2d 259, 263-64 (5th Cir. 1987) ("There is a fundamental difference between contractual regulations of the rate of maintenance payments and contractual elimination of such payments altogether.") With these principles in mind, Maersk does not dispute Plaintiff's entitlement to unearned wages but rather argues that the wage rate set forth in the Standard Freightship Agreement and the Particulars of Engagement and Discharge controls and overtime is not factored into the calculation of unearned wages.

The agreement between Maersk and Padilla's union, the Seafarers International Union, provides at Article V, Section 1 ("Wages") that Padilla's monthly rate of wages as a Chief Cook in the Steward Department amounts to $3,051 per month. (See the 2006 Standard Freightship Agreement attached hereto as Exhibit

11

NYDOCS1/305682.1

Page 12

"A") to the O'Connell declaration.  On a daily basis, Padilla's wages amount to $101.73.  Upon boarding the MAERSK ARKANSAS, Padilla acknowledged the aforementioned wage rate by signing the Particulars of Engagement and Discharge. (See Particulars of Engagement and Discharge ("Acceptance of Employment" section) attached hereto as Exhibit "B") to the O'Connell declaration.  A week later, Padilla was discharged from the vessel and again acknowledged the daily wage rate of $101.73.  (See Particulars of Engagement and Discharge ("Voyage Discharge-Release Information" section) attached hereto as Exhibit "B") to the O'Connell declaration.  As Maersk paid the contracted wage rate until February 26, 2007, when the voyage ended, no further payment is due to the Plaintiff.

### Conclusion

Based on the foregoing, Plaintiff's motion for summary judgment must be denied.

Dated:    New York, New York
          June 19, 2008

                              Respectfully submitted,
                              FREEHILL HOGAN & MAHAR, LLP
                              Attorneys for Defendant
                              MAERSK LINE LIMITED

                    By: _____
                              John J. Walsh
                              Daniel J. Fitzgerald
                              80 Pine Street
                              New York, New York 10005
                              (212) 425-1900

12

Page 13

TO:    Dennis M. O'Bryan
       O'Bryan Baun Cohen Kuebler
       401 South Old Woodward, Suite 320
       Birmingham, MI  48009
       248-258-6262

NYDOCS1/305682.1

Page 14

## AFFIDAVIT OF SERVICE VIA FIRST CLASS MAIL

STATE OF NEW YORK    )
                       ) ss:

COUNTY OF NEW YORK  )

I, Rosemarie Rizzi, being duly sworn, depose and say:

That I am not a party to the within action, am over 18 years of age and reside in Brooklyn, New York.

That on June 19, 2008, I served the within **Memorandum of Law in Opposition to Motion to Compel Payment of Overtime** upon the attorneys/individuals at his/her listed addresses which were so designated by said attorneys of said purpose, by depositing a true copy of same enclosed in a post paid properly addressed wrapper in a post office under the exclusive care and custody of the U.S. Postal Service within the State of New York:

TO:   Dennis M. O'Bryan
      O'Bryan Baun Cohen Kuebler
      401 South Old Woodward, Suite 320
      Birmingham, MI 48009
      248-258-6262

Rosemarie Rizzi

Sworn to before me this
19th day of June 2008

Notary Public

MELISSA COLFORD
Commissioner of Deeds
City of New York-No. 5-1692
Certificate Filed in New York
Commission Expires 4/1/10

14

NYDOCS1/305682.1