USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/12/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN PADILLA,

          Plaintiff,

   - against -

MAERSK LINE, LTD.,

          Defendant.

**OPINION AND ORDER**

07 Civ. 3638 (PKL)

**APPEARANCES**

O'BRYAN BAUN COHEN KEUBLER KARAMANIAN
401 S. Old Woodward, Ste. 450
Birmingham, MI  48009
Dennis M. O'Bryan, Esq.

Attorneys for John Padilla

FREEHILL HOGAN & MAHAR, LLP
80 Pine Street
New York, NY  10005
John J. Walsh, Esq.
Daniel J. Fitzgerald, Esq.

Attorneys for Maersk Line, Ltd.

**LEISURE, District Judge:**

This matter is before the Court upon plaintiff John Padilla's ("Padilla") motion to compel his employer, defendant Maersk Line, Ltd. ("Maersk"), to pay overtime compensation to plaintiff as part of his entitlement to unearned wages.  For the reasons stated below, this motion is GRANTED.

**BACKGROUND**

Padilla brings a complaint on behalf of himself and a proposed class of similarly-situated seamen against Maersk[1] under general maritime law for unearned wages.  Padilla claims that he and other similarly situated seamen suffered illness and injury in the service of Maersk's vessels. (Compl. ¶ 3.)  Furthermore, Padilla claims that Maersk paid him unearned wages until the end of voyage, along with maintenance and cure, but failed to pay overtime wages that Padilla otherwise would have earned in service aboard Maersk's vessel. (See id. ¶¶ 3-4.)

A.   Factual History

The essential facts are undisputed.  On October 30, 2006, Padilla was hired as Chief Cook aboard defendant's vessel, the Maersk Arkansas. (Def.'s Opp'n 1; O'Connell Decl. ¶ 1.)[2]  Maersk

---

[1] On May 8, 2007, Padilla filed his complaint, naming the United States as sole defendant.  On September 13, 2007, plaintiff filed an amended complaint, adding Maersk as defendant.  On October 3, 2007, Padilla voluntarily dismissed the action against the United States.  Thus, Maersk is the only remaining defendant in this action.

[2] Citations to "Def.'s Opp'n" refer to the Memorandum of Law in Opposition to Motion to Compel Payment of Overtime.  Citations to "Pl.'s Mem." refer to the

1

and Padilla's union, the Seafarers International Union ("SIU"), are parties to a collective bargaining agreement known as the Standard Freightship Agreement (the "CBA").[3] (O'Connell Decl. ¶ 2.)  Pursuant to Article V, Section 1 ("Wages") of the CBA, a Chief Cook in the Steward Department is entitled to regular monthly wages of $3,051.76. (Def.'s Opp'n 1; O'Connell Decl. Ex. A at 50.)  In addition, the CBA provides that wages "will be paid on a day for day basis on all contracted vessels . . . ." (O'Connell Decl. Ex. A at 27.)  Accordingly, the Particulars of Engagement and Discharge (the "shipping articles"[4]) that Padilla signed upon boarding the Maersk Arkansas list Padilla's regular daily wage rate as $101.73, which Maersk calculated by dividing the monthly wage rate in the CBA by 30. (Def.'s Opp'n 1; O'Connell Decl. Ex. B.)

---

Memorandum in Support of Motion to Compel Payment of Overtime Re: Unearned Wages.  Citations to "Pl.'s Reply" refer to Plaintiff's Reply to Defendant's Memorandum of Law in Opposition to Motion to Compel Payment of Overtime. Citations to "O'Connell Decl." refer to the Declaration of Catherine O'Connell, Jones Act Claims Manager for Maersk, dated June 12, 2008 and attached as Exhibit 3 to Maersk's opposition brief.  Citations to "Berger Decl." refer to the Declaration of Carol Berger, General Manager, Quality Environment, Safety and Security for Maersk, dated June 10, 2008 and attached as Exhibit 2 to Maersk's opposition brief.  Citations to "Padilla Aff." Refer to the Affidavit of John Padilla, sworn to on February 25, 2008, attached as Exhibit 2 to plaintiff's moving brief.

[3] The CBA was executed June 16, 2006 and is in effect until June 30, 2011, and thus covers Padilla's employment aboard the Maersk Arkansas for the voyage commencing October 30, 2006. (Padilla Aff. Ex.; O'Connell Decl. Ex. A.)
[4] Plaintiff's Reply brief indicates that the Particulars of Engagement and Discharge constitute shipping articles between the master and each seaman. (Pl.'s Reply 1.)

Padilla's sworn testimony is that his regular shift lasted from 6:30 a.m. to 6:30 p.m. (Pl.'s Dep. 29:2, Mar. 26, 2008)[5], with a coffee break from 9:30-10:30 a.m. and a longer break from 1:00 p.m. to 4:00 p.m. (Id. 29:13-18.)  This testimony is consistent with the terms of the CBA, which states that a Chief Cook is required to work eight (8) hours between 6:30 a.m. and 6:30 p.m. (O'Connell Decl. Ex. A at 50.)  Pursuant to Article II, Section 21 ("Overtime Rates and Penalty Rates") of the CBA, a Chief Cook in the Steward Department earns $21.06 per hour for all work in excess of eight (8) hours Monday through Friday and any work performed on Saturdays, Sundays, or holidays. (O'Connell Decl. Ex. A at 10, 50.)  Although the head of each department must authorize overtime work (id. at 14; see also Pl.'s Dep. 91:17-18), Padilla swears that, on a weekly basis prior to his injury, he performed three (3) overtime hours each weekday and eleven (11) overtime hours each Saturday, Sunday, and holiday. (Padilla Aff. ¶¶ 2-3.)  This testimony is consistent with the payroll vouchers for Padilla that Maersk submitted. (See O'Connell Decl. Ex. C.)  In addition, at his deposition, Padilla explained that some duties essential to maintaining a well-run ship, such as sougeeing the galley and working the stores, automatically required him to work overtime

---

[5] Pages from Padilla's March 26, 2008 deposition are attached to Padilla's moving brief as Exhibit 3 and to Maersk's opposition brief as Exhibit 1.

each week. (Pl.'s Dep. 88, 91:23-92:8, 93-94.)  This testimony

is also consistent with the CBA, which contemplates that, for

members of the Steward Department, certain "non-routine" work,

such as preparing and serving night lunches, sougeeing, or any

work not specifically designated in the CBA will automatically

be paid at the applicable overtime rate. (See O'Connell Decl.

Ex. A at 52-55; see also Pl.'s Dep. 94:16-17.)

    After eight days of service aboard the MV Arkansas, Padilla

was discharged and repatriated at the Port of Salalah, Oman, on

November 6, 2006. (See Def.'s Opp'n 2; Berger Decl. ¶ 7;

O'Connell Decl. Ex. B.)  At that time, Padilla signed off the

ship's articles, which indicated that he was "unfit for duty."

(Def.'s Opp'n 2; O'Connell Decl. Ex. B.)  In addition, the

shipping articles indicate that the balance of earned wages owed

to Padilla[6] at discharge totaled $1,090.00 and included six days

of regular wages plus 34 hours of overtime wages.[7]  (O'Connell

Decl. Exs. B & C.)

    The Maersk Arkansas's voyage ended on February 26, 2007.

(Berger Decl. ¶ 8; O'Connell Decl. ¶ 9.)  Maersk paid Padilla

unearned wages at a daily rate of $101.73, along with

---

[6] Pursuant to Article II, Section 14 ("Repatriation, Upkeep, and
Transportation"), when "a seaman leaves the vessel due to illness or injury
and such illness or injury has been known prior to his leaving, he shall
receive a full statement of his account showing wages due him." (O'Connell
Decl. Ex. A at 7.)
[7] According to his first payroll voucher, Padilla also earned two days of
regular wages plus three (3) hours of overtime wages for the period of
October 30-31, 2006. (O'Connell Decl. Ex. C.)

4

maintenance payments of \$16 per day,[8] from Padilla's discharge until February 26, 2007. (Def.'s Opp'n 2.) Carol Berger, General Manager, Quality Environment, Safety and Security for Maersk, attests that it is not her practice to factor overtime wages into any calculation of unearned wages, and she is unaware of any company in the industry that includes overtime wages in its unearned wage calculations. (Berger Decl. ¶¶ 6, 9.) However, Catherine O'Connell, Maersk's Jones Act Claims Manager, attests that when Maersk enters into negotiations with a seaman to settle a Jones Act claim, she will recommend that Maersk include overtime in unearned wages to induce the seaman to settle his claim. (O'Connell Decl. ¶ 6.)

Padilla testified at his deposition that he contacted Maersk to request payment of overtime wages that he would have earned but for his injury, but Maersk denied his request, stating that it did not pay overtime as unearned wages. (Pl.'s Dep. 62:2-17.) In addition, Padilla's testimony indicates that at least one other company has paid him unearned wages consisting of his daily base wage plus overtime he would have earned but for injury or illness. (Id. 63:3-15.) Maersk indicates that Padilla's replacement man aboard the Maersk

---

[8] Section II, Article 13 ("Maintenance and Cure") of the CBA states that "[w]hen a member of the Unlicensed Personnel is entitled to Maintenance and Cure under Maritime Law, he shall be paid maintenance at the rate of sixteen dollars (\$16.00) per day for each day or part thereof of entitlement." (O'Connell Decl. Ex. A at 6.)

Arkansas earned $15,103.52 in overtime wages during his 108 days
of service on the Maersk Arkansas. (Pl.'s Reply 3 & Ex. A.)

B.     Procedural History

At a December 13, 2007 pre-trial conference before this
Court, the parties agreed to have the Court determine
defendant's liability for overtime wages as unearned wages prior
to addressing whether the action is suitable for class action
status.   Now before the Court is Padilla's motion for judgment
on the merits with respect to Maersk's liability for payment of
overtime wages.

### DISCUSSION

Padilla argues that overtime wages are payable as unearned
wages. (Pl.'s Mem. 2.)   Padilla relies on Lamont v. United
States, 613 F. Supp. 588, 592-93 (S.D.N.Y. 1985) (Duffy, J.) for
the proposition that a seaman may recover overtime as a
component of unearned wages where it was the "apparent custom
and practice . . . of the seamen working a substantial amount of
overtime" such that overtime was a "common expectation" of the
seamen's remuneration and where "such an assessment [of overtime
wages] can be made without speculation." (Id. 6-8 (quoting
Lamont, 613 F. Supp. at 593) (internal quotation marks
removed).)   Similarly, in this action, Padilla asserts that an
overtime assessment can be made without speculation based on
Padilla's testimony regarding the average overtime he worked

prior to his injury. (Id. 8-9.)  In this vein, Padilla asserts

that, at an average overtime of three (3) hours per weekday and

eleven (11) hours each weekend day and holiday, paid at the

applicable rate of $21.06, the amount of overtime wages Padilla

is owed total $12,972.96. (Pl.'s Mem. 9.)  In the alternative,

Padilla argues the amount of overtime wages he is owed can be

readily ascertained based on the overtime wages paid to

Padilla's replacement man until the end of the ship's voyage,

which total $15,103.52. (Id. 9; Pl.'s Reply 3 & Ex. A.)

Maersk does not dispute that Padilla is entitled to payment

of unearned wages until the end of the ship's voyage. (Def.'s

Mem. 4.)  In fact, Maersk asserts that it paid Padilla unearned

wages at the wage rate specified for a Chief Cook in the Steward

Department in Article V, Section 1 ("Wages") of the CBA, and in

the shipping articles, from the onset of Padilla's injury until

the voyage ended. (Id. 12.)  Although Maersk does not agree that

overtime wages should be included in unearned wage calculations,

Maersk contends that even if a seaman's right to unearned wages

includes overtime wages, Padilla's entitlement to unearned wages

was contractually modified. (Id. 5, 9-10.)  Maersk argues that

the wage rate indicated in the shipping articles is the rate at

which Maersk is obligated to pay Padilla's unearned wages, and

overtime pay is not factored into that applicable wage rate.

(Id. 8, 11-12.)  Furthermore, Maersk contends that even if

Padilla is entitled to receive unearned overtime pay, summary judgment must be denied because there is a genuine issue of material fact as to the amount of overtime Padilla would have earned but for his injury. (Id. 3-4.)

Thus, the first issue before the Court is whether, as a matter of law, overtime pay is factored into unearned wage calculations for purposes of an incapacitated seaman's entitlement to maintenance and cure under general maritime law. For the reasons stated below, we conclude that it is, to the extent that overtime compensation the seaman would have earned but for his or her injury is readily ascertainable. In addition, the Court must determine whether Padilla's general maritime right to unearned wages was contractually modified so as to preclude Padilla's recovery of overtime benefits as a matter of law. As discussed below, the Court finds that Padilla's general maritime right to overtime pay as part of his unearned wages was not contractually modified, and can be reasonably ascertained based on his average overtime earned prior to injury.

I.   Applicable Law

A.   Standard of Review

At the outset, the Court must determine under what standard it should consider plaintiff's motion.  Plaintiff has styled his motion as one to compel payment of overtime wages commensurate

8

with his entitlement to unearned wages. Plaintiff argues that
the Court can consider his motion under a lesser showing than
required for summary judgment, and primarily relies on cases
outside the Second Circuit in support of this proposition. (See
Pl.'s Mem. 4-5.)[9]  Plaintiff acknowledges that a summary judgment
standard would otherwise apply. (Id. 5.)  Defendant's opposition
to the instant motion assumes the application of a summary
judgment standard. (Def.'s Opp'n Mem. 2-3.)

Some district courts that are hesitant to apply a summary
judgment standard find that, where a seaman is the moving party
on summary judgment, the Supreme Court's instruction that
ambiguities in the area of maintenance and cure are to be
resolved in favor of seamen, see Vaughan v. Atkinson, 369 U.S.
527, 532 (1962), is somewhat at odds with the requirement that,
on summary judgment, courts resolve reasonable doubts against
the moving party and draw all inferences in the light most
favorable to the non-moving party. See, e.g., Best v. Pasha Haw.
Transp. Lines, L.L.C., No 06-00634, 2008 WL 1968334, at *1 (D.

---

[9] The Court notes that the only case in this district that plaintiff cites
where a court ordered payment of maintenance and cure without applying a
summary judgment standard involves reinstatement of maintenance and cure
payments that an employer admittedly owed. See Seri v. Queen of Hearts
Cruise, Inc., No. 01 Civ. 6985, 2003 WL 21835736, at *1 (S.D.N.Y. Aug. 6,
2003).  Because liability for such payments was not at issue, Seri is
distinguishable from plaintiff's instant request for pre-trial determination
of liability on the merits.  Another case in this district that plaintiff
cites in support of his contention that the court should apply a lesser
standard of review than summary judgment, Durfor v. K-Sea Transp. Corp., No.
00 Civ. 6782, 2001 WL 856612 (S.D.N.Y. July 30, 2001), was abrogated by the
Second Circuit in Ammar v. United States, 342 F.3d 133 (2d Cir. 2003).

9

Haw. May 6, 2008) (noting that some district courts in the Ninth Circuit "have found that the summary judgment standard is inappropriate [where the seaman is the moving party] because it does not account for the flexible approach courts should take in admiralty law cases and the deference courts should provide to seamen," but declining to determine the appropriate standard of review because there was no factual dispute that plaintiff was entitled to maintenance and cure); McCart v. Prysmian Power Cables and Sys. USA, LLC, No. C06-1062RSM, 2007 WL 2257149, at *1 (W.D. Wash. Aug. 3, 2007) ("On motions to compel maintenance, courts do not traditionally employ the strict summary judgment standard of review."); Connors v. Iqueque, No. C05-334JLR, 2005 WL 2206922, at *1 (W.D. Wash. Aug. 25, 2005) (noting that, where seaman is moving party on summary judgment, drawing all inferences in the light most favorable to the non-moving party "squares awkwardly with the Supreme Court's instructions to defer to seamen in determining maintenance and cure questions"). Generally, however, a pre-trial motion for determining the merits of a claim is treated as a motion for summary judgment. See McNeil v. Jantran, Inc., 258 F. Supp. 2d 926, 930 (W.D. Ark. 2003) (stating that "[o]ther than a motion for summary judgment, we are aware of no procedure for obtaining pre-trial judgment on the merits of a claim" and applying summary judgment standard to motion for retroactive and future maintenance and cure).

Because courts in this district routinely analyze motions to compel maintenance under a summary judgment standard, see, e.g., Covella v. Buchanan Marine, No. 95 Civ. 6514, 1996 WL 164482 (S.D.N.Y. Apr. 9, 1996); Maloney v. Bouchard Transp. Co., Inc., No. 89 Civ. 6254, 1990 WL 96988 (S.D.N.Y. July 2, 1990) (Keenan, J.), and the issue is one that can properly be resolved on summary judgment, the Court will apply a summary judgment standard to the instant motion.

Rule 56 of the Federal Rules of Civil Procedure allows for the entry of summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the "heavy burden" of demonstrating that no genuine issue as to any material fact exists and that it is therefore entitled to judgment as a matter of law. Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc., 182 F.3d 157, 160 (2d Cir. 1999); accord Atl. Mut. Ins. Co. v. CSX Lines, L.L.C., 432 F.3d 428, 433 (2d Cir. 2005) ("'The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment . . . .'" (quoting Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004))); Chambers v. TRM Copy Ctrs. Corp., 43

11

F.3d 29, 36 (2d Cir. 1994) (Kearse, J.). Nonetheless, summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

A district court "must resolve all ambiguities and draw all inferences in favor of the non-moving party," such that "[i]f there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper." Westinghouse Credit Corp. v. D'Urso, 278 F.3d 138, 145 (2d Cir. 2002); accord Brown v. Cara, 420 F.3d 148, 152 (2d Cir. 2005). Of course, "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). "A dispute as to a material fact is 'genuine,' and hence summary judgment is not appropriate, under this standard, only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. (quoting Anderson, 477 U.S. at 248); accord N.Y. Stock Exch., Inc. v. New York, N.Y. Hotel LLC,

293 F.3d 550, 554 (2d Cir. 2002). "[T]he law provides no magical talisman or compass that will serve as an unerring guide to determine when a material issue of fact is presented. As is so often true in the law, this is a matter of informed and properly reasoned judgment." Am. Mfrs. Mut. Ins. Co. v. Am. Broadcasting-Paramount Theatres, Inc., 388 F.2d 272, 279 (2d Cir. 1967).

### B. A Seaman's Traditional Maritime Remedies

The general maritime law of the United States provides seamen who have become ill or injured while in a ship's service with the right to "maintenance and cure" from his or her employer. Ammar v. United States, 342 F.3d 133, 142 (2d Cir. 2003). "Maintenance" is the right of an injured or ill seaman to food and lodging comparable to the kind and quality received aboard ship, while "cure" is such seaman's right to necessary medical services. See Wills v. Amerada Hess Corp., 379 F.3d 32, 52 (2d Cir. 2004) (citation omitted); Thomas J. Schoenbaum, Admiralty and Maritime Law § 4-28, at 303 (4th ed. 2004). In addition, a seaman is entitled to recover wages he would have earned if not for the onset of injury or illness ("unearned wages"). See The Osceola, 189 U.S. 158, 175 (1903), superseded on other grounds by Jones Act, 46 U.S.C. § 30104; Rodriguez Alvarez v. Bahama Cruise Line, Inc., 898 F.2d 312, 315 (2d Cir. 1990) ("When a seaman is injured during his employment on a

ship, the ship operator is liable not only for the seaman's
maintenance and cure, but also for lost wages." (citations
omitted)); McMillan v. Tug Jane A. Bouchard, 885 F. Supp. 452,
459 n.9 (E.D.N.Y. 1995) ("In addition to maintenance, an injured
seaman is entitled to receive unearned wages until the scheduled
end of his or her voyage or term of employment." (citation
omitted)); see also Lamont, 613 F. Supp. at 591 ("The right to
unearned wages is 'ancient'. . . ."); Ladzinski v. Sperling S.S.
& Trading Corp., 300 F. Supp. 947, 949 (S.D.N.Y. 1969)("Even if
the contract between the seaman and the shipowner makes no
provision for maintenance and cure and unearned wages, they are
recoverable under the general maritime law."). Therefore, the
common law maintenance and cure remedy is comprised of three
elements:  (1) a living allowance during the recovery period,
(2) reimbursement for medical expenses, and (3) unearned wages
for a limited period. Gardiner v. Sea-Land Serv., Inc., 786 F.2d
943, 946 (9th Cir. 1986); see also Flores v. Carnival Cruise
Lines, 47 F.3d 1120, 1122 (11th Cir. 1995) ("Although the
recovery of unearned wages technically is a separate element of
recovery from those for maintenance expenses or cure expenses,
'it is settled law that wages is a basic component of an award
of maintenance and cure.'" (citation omitted)).

     A shipowner's obligation to furnish maintenance and cure
continues "to the point where the maximum attainable [medical]

                              14

cure has been reached." Taylor v. Bouchard Transp. Co., No. 89
Civ. 5965, 1991 WL 107279, at *4 (S.D.N.Y. June 12, 1991)
(Leisure, J.) (citing Rodriguez Alvarez, 898 F.2d at 314-15).
That is, the obligation to pay maintenance and cure "continues
until the seaman has recovered or his condition is declared
permanent and incurable." Ammar, 342 F.3d at 142 (citations
omitted); see McMillan, 885 F. Supp. at 459 (stating that
obligation continues "until the seaman recovers from the injury,
the condition permanently stabilizes, or cannot be improved
further"). In addition, a shipowner is obligated to pay an
injured or ill seaman unearned wages until the ship's voyage
ends or until the seaman reaches maximum cure, whichever is
sooner.[10] Berg v. Fourth Shipmor Assocs., 82 F.3d 307, 310 (9th
Cir. 1996). "Th[e] [maintenance, cure, and unearned wages]
obligation attaches regardless of fault, provided that a
sailor's malady is not the result of his or her own gross
misconduct." Calo v. Ocean Ships, Inc., 57 F.3d 159, 162 (2d
Cir. 1995); see Berg, 82 F.3d at 309; see also Ammar, 342 F.3d
at 142 ("The duty to pay maintenance arises regardless of
whether the shipowner was negligent and regardless of whether

---

[10] "Unlike maintenance and cure which may extend for a reasonable period
beyond the expiration of the voyage until the point of maximum cure
attainable has been reached, wages cease with the end of the voyage or the
end of the engagement (whichever properly can be considered as the terminal
point) and cannot extend beyond such period of time." Blainey v. Am. S.S.
Co., 990 F.2d 885, 890 (6th Cir. 1993) (internal quotation marks and citation
omitted).

15

the illness or injury was job-related. . . ."); McMillan, 885 F.
Supp. at 459 ("[T]ort law rules of contributory negligence,
comparative fault, assumption of risk, and unseaworthiness do
not apply.").

The seaman bears the burden of proving his or her right to
maintenance and cure. Seri v. Queen of Hearts Cruise, Inc., No.
01 Civ. 6985, 2003 WL 21835736, at *1 (S.D.N.Y. Aug. 6, 2003);
McMillan, 885 F. Supp. at 459. However, claims for maintenance
and cure are construed expansively, and all ambiguities and
doubts regarding a shipowner's liability for maintenance and
cure are to be resolved in favor of the seaman. Vaughan, 369
U.S. at 532; see also Seri, 2003 WL 21835736, at *1 (stating
that a presumption of entitlement exists in the seaman's favor
(citing Breese v. AWI Inc., 823 F.2d 100, 104 (5th Cir. 1987))).

C. Provisions in Collective Bargaining Agreements
for Computing Maintenance, Cure, and Wages

Although the Court has found no binding precedent in this
Circuit regarding whether a CBA may limit a seaman's recovery of
unearned wages, cf. Cabrera Espinal v. Royal Caribbean Cruises,
Ltd., 253 F.3d 629, 632 (11th Cir. 2001) (concluding that
"nothing in maritime law" prevents a CBA from limiting the
amount of unearned wages, even where such amount may be below a
seaman's average earned wages); Lipscomb v. Foss Mar. Co., 83
F.3d 1106, 1108 (9th Cir. 1996) (explaining that the "general

16

maritime law right to maintenance, cure, and unearned wages . . . is imposed by law and cannot be abrogated by contract, . . . although the method for calculating the amount of maintenance, cure, and wages may be determined by the collective bargaining process . . . ." (citations omitted)), the Second Circuit has joined the majority of Circuit Courts of Appeals in holding that union-negotiated CBA's may limit — but not abrogate — the maritime remedy of maintenance. See Ammar, 342 F.3d at 146-47; see also Frederick v. Kirby Tankships, Inc., 205 F.3d 1277, 1292 (11th Cir. 2000); Baldassaro v. United States, 64 F.3d 206, 212-13 (5th Cir. 1995); Al-Zawkari v. Am. S.S. Co., 871 F.2d 585, 588 (6th Cir. 1989); Macedo v. F/V Paul & Michelle, 868 F.2d 519, 522 (1st Cir. 1989); Gardiner, 786 F.2d at 949-50. But see Barnes v. Andover Co., L.P., 900 F.2d 630, 640 (3d Cir. 1990) ("[A] union cannot bargain away the individual seaman's common law right to maintenance by agreeing to a wholly inadequate figure as a daily maintenance rate."). The Second Circuit in Ammar noted that seamen now have large and powerful unions to represent their interests, which undercuts the traditional notion that seamen are a "friendless" class and, accordingly, there is less "need for judicial intervention to protect seamen . . . ." 342 F.3d at 146. "[I]n light of the reality of modern circumstances, the appropriate accommodation between federal maritime common law and federal common law for the enforcement

of collective bargaining agreements is to allow unionized seamen to bargain for rights and privileges they prefer in exchange for" limits on computing maintenance, so long as the CBA's are legitimately negotiated and the seamen's interests are adequately represented. Id. Even though not specifically addressed in Ammar, this Court would extend the same deference to CBA limits on the computation of unearned wages. See Aldahe v. Matson Navigation Co., Inc., 06-CV-11125, 2006 WL 2069419, at *3 (E.D. Mich. July 26, 2006) ("Because the rights to cure and to unearned wages are equally predicated on the contours of vague common law, those rights are also susceptible to modification by contract."); see also Dowdle v. Offshore Express, Inc., 809 F.2d 259, 263 (5th Cir. 1987) (finding unearned wages inseparable from maintenance and cure).

The Second Circuit has instructed district courts to view union-negotiated packages of compensation and benefits in the maritime context as a whole and accord deference to the entire package, even where certain limitations, viewed in isolation, may appear inadequate. Ammar, 342 F.3d at 146. Yet, the Second Circuit has also advised district courts to "be careful to determine what were the actual terms agreed to by the parties to a CBA, and not impose a limitation . . . where none was intended or agreed to." Marcic v. Reinauer Transp. Cos., 397 F.3d 120, 131 (2d Cir. 2005); accord Lipscomb, 83 F.3d at 1109 ("Only if

18

the [CBA] 'express[ly]' provides for a different computation of
maintenance, cure, and wages does it modify the general maritime
law." (quoting Gardiner, 786 F.2d at 949)).  Such a view accords
with the traditional nature and breadth of the maintenance and
cure remedy. Lipscomb, 83 F.3d at 1110; see also Vaughan, 369
U.S. at 532 (declaring that "the shipowner's liability for
maintenance and cure was among 'the most pervasive' of all and
that it was not to be defeated by restrictive distinctions nor
'narrowly confined'" (quoting Aguilar v. Standard Oil Co., 318
U.S. 724, 730 (1943))); Farrell v. United States, 336 U.S. 511,
516 (1949)("It has been the merit of the seaman's right to
maintenance and cure that it is so inclusive as to be relatively
simple, and can be understood and administered without technical
considerations.").

### D.    Payment of Unearned Overtime Wages

The Second Circuit has not directly addressed whether a
seaman may recover reasonably expected overtime wages as part of
his entitlement to unearned wages.  However, Judge Duffy's
decision in Lamont v. United States is persuasive on this point.
613 F. Supp. at 588 (cited in Schoenbaum, supra, at 309 n.7).
In Lamont, Judge Duffy was presented with the question of
whether "'overtime' normally paid to a healthy seaman [is] to be
included in calculating the benefits due to a seaman who becomes
ill or is injured while in service of a ship." Id. at 589.  The

19

plaintiff seaman in Lamont had earned overtime benefits
amounting to ninety-one (91) percent of his base wages prior to
his injury.[11] Id. at 593. In light of the "custom and practice"
of the seaman's ship to pay overtime in an amount nearly equal
to the base wages paid, Judge Duffy reasoned that overtime was a
"common expectation" of the seamen who signed the ship's
articles. Id. Because much of the seaman's income was derived
from overtime compensation, Judge Duffy awarded the seaman
overtime pay as part of his unearned wages, reasoning that the
seaman was "entitled to recover, in full, the compensation that
he would have earned but for his illness or injury as such
assessment can be made without speculation." Id.

Other courts outside this Circuit have also adopted "but
for" tests and concluded that benefits such as tip income and
vacation pay constitute "unearned wages" for purposes of a
seaman's entitlement to maintenance, cure, and unearned wages.
See Aksoy v. Apollo Ship Chandlers, Inc., 137 F.3d 1304, 1306
(11th Cir. 1998) (per curiam) (calculating unearned wages as
average tip income plus guaranteed minimum wage); Lipscomb, 83
F.3d at 1109 (concluding accumulated time off ("ATO") is part of
seaman's unearned wages under general maritime law); Flores, 47
F.3d at 1123 (holding that measure of seaman's unearned wages

---

[11] In Lamont, the parties stipulated to the average overtime earnings for a
seaman such as plaintiff aboard defendant's vessel. 613 F. Supp. at 593.

should include tip income); Morel v. Sabine Towing & Transp.

Co., 669 F.2d 345, 346 (5th Cir. 1982) (concluding

"[a]ccumulated leave time, paid vacation, is part of a seaman's

total wages" and payable under general maritime law in addition

to maintenance); Shaw v. Ohio River Co., 526 F.2d 193, 199 (3d

Cir. 1975) (same). Some of these cases have followed Judge

Duffy's reasoning in Lamont that where it is the custom,

practice, and expectation of the parties that a seaman will

receive certain benefits as compensation during his service

aboard the ship, such benefits are recoverable as unearned wages

in order to place the seaman in the same position he would have

been in had he continued to work. See, e.g., Lipscomb, 83 F.3d

at 1109; Aksoy, 137 F.3d at 1306; Flores, 47 F.3d at 1125-26.

For example, plaintiff in Lipscomb earned ATO in addition

to a base wage while in the service of defendant's ship. 83 F.3d

at 1108. The CBA between defendant and plaintiff's union was

silent as to the amount to be provided an ill or injured seaman

as unearned wages. Id. at 1109. The Ninth Circuit reasoned that

ATO was "a benefit directly attributable to the seaman's work on

the vessel and is an inherent part of his wage agreement." Id.

Accordingly, the Ninth Circuit found that "[t]he purposes behind

the right to maintenance and cure are best served by paying an

injured seaman the compensation he would have earned but for his

21

injury," id. at 1110, and awarded plaintiff ATO as part of his unearned wages under the general maritime law. Id. at 1111.

Similarly, in Flores, plaintiff claimed that, upon becoming injured, his entitlement to unearned wages included tips he could have earned had he been able to complete his employment contract. 47 F.3d at 1121-22. The Eleventh Circuit agreed with plaintiff and mandated that the calculation of unearned wages include unearned tips. Id. at 1127. The Eleventh Circuit reasoned that although plaintiff's employment contract did not guarantee any amount of tips and was silent as to how unearned wages would be calculated, the custom, practice, and expectations of the parties were that tip earnings would constitute the majority of plaintiff's salary. Id.

Likewise, in Aksoy, another tip income case before the Eleventh Circuit, plaintiff's "contract did not purport to place a limit on the amount of unearned wages [plaintiff] was entitled to receive . . . ." 137 F.3d at 1306.[12]  Because the custom, practice, and expectations of the parties were that a substantial portion of plaintiff's income would derive from tip income, the Aksoy court concluded that the only way to place plaintiff "in the same position he would have been in had he continued to work" was to allow plaintiff to recover as unearned

---

[12] Because plaintiff's contract was silent as to the amount of unearned wages plaintiff was entitled to receive, the Aksoy court left for another day the question of "whether the right to unearned wages may be modified by contract . . . ." 137 F.3d at 1306.

wages the amount of his average weekly tip income in addition to his guaranteed minimum wage. Id.

## II.   Application

### A.   Whether Padilla is Entitled to Include Overtime Wages in the Measure of Unearned Wages

This Court follows Lamont, and subsequent Circuit Court cases following Judge Duffy's reasoning in Lamont, and concludes that an injured seaman is entitled to include his average overtime earnings in the unearned wage component of his maintenance and cure remedy.  In this case, Padilla reasonably expected to earn overtime pay, which prior to his injury amounted on average to over 100 percent of his regular earnings.[13]  Moreover, Padilla's replacement man received overtime pay in excess of 100 percent of a Chief Cook's base wage under the CBA.[14]  Thus, the custom and practice aboard defendant's vessel was to pay seamen such as Padilla overtime in excess of amounts paid as base wages.  To recover in full the compensation that he would have earned but for his injury, this Court finds that the average overtime income Padilla had earned prior to his injury must, as a matter of law, be included in the measure of his unearned wages.

---

[13] For example, Padilla's payroll voucher for the period November 1, 2006 through November 6, 2006 reflects $610.38 in base wages and $716.04 in overtime wages. (See O'Connell Decl. Ex. C.)

[14] For example, Padilla's replacement man's payroll vouchers for the periods December 1, 2006 through December 31, 2006 and January 1, 2007 through January 31, 2007 each reflect base wages of $3,153.63 and overtime wages of $4,654.26.

B.    Whether Padilla's Rate of Unearned Wages Was
      Contractually Modified

Unless contractually modified, Padilla is entitled to

recover, as part of his unearned wages, unearned overtime pay

from the onset of his injury until the voyage ended on February

26, 2006.  Since Maersk concedes that the CBA is silent as to a

seaman's unearned wage rate (see Def.'s Opp'n 9), the CBA

governing Padilla's employment with Maersk does not modify

Padilla's general maritime law right to unearned wages. See

Lipscomb, 83 F.3d at 1109.  Accordingly, the CBA does not

purport to limit the inclusion of overtime pay in the

calculation of Padilla's unearned wages.

However, Maersk argues that the shipping articles signed by

Padilla upon boarding the vessel on October 30, 2006 and at his

discharge on November 6, 2006 contractually limit Padilla's

entitlement to unearned wages to $101.73 per day. (Def.'s Opp'n

9, 11-12; O'Connell Decl. Ex. B.)  Therefore, the Court must

next determine whether, as a matter of law, the shipping

articles modified Padilla's general maritime law right to

recover reasonably expected overtime as part of his unearned

wages.

On foreign voyages, written shipping articles are required

by statute. See 46 U.S.C. § 10302.  Traditionally, shipping

articles are engagement agreements between "the crew members and

24

the employer shipowner, in which the employer agrees to pay wages for services rendered by the seamen." Blainey v. Am. S.S. Co., 990 F.2d 885, 888 (6th Cir. 1993); see also 46 U.S.C. § 10302(b)(4) (requiring the articles to contain "the amount of wages each seaman is to receive"). In addition, "[s]igning ship's articles makes a seaman subject to the rules and discipline of the ship . . . ." Mahramas v. Am. Export Isbrandtsen Lines, Inc., 475 F.2d 165, 171 n.9 (2d Cir. 1973). "The articles, when in doubt, are most strongly construed against the ship." The Thomas Tracy, 24 F.2d 372, 374 (2d Cir. 1928); see Mason v. Tex. Co., 76 F. Supp. 318, 321 (D. Mass. 1948) ("Since [shipping articles] are prepared by the master of the ship, any ambiguity in the language used should be construed liberally in favor of the seaman."); The Catalonia, 236 F. 554, 556 (E.D. Va. 1916) ("[A]s between [seamen] and the master, the articles should be construed liberally in their favor, since the same were the product of the master, and not of themselves.").

Maersk has not cited any case law that stands for the proposition that shipping articles can alter the remedies provided for under general maritime law. Instead, Maersk relies on case law where courts have deferred to limits imposed by union-negotiated CBA's on an incapacitated seaman's rate of maintenance or sick wages. (See Def.'s Opp'n 5-8.) In doing so, Maersk appears to argue for an extension of such case law to

limits on wage rates purportedly imposed by shipping articles.
(See id. 8 ("Here, [p]laintiff's compensation package was
negotiated and the wage rate expressly set forth in the signed
Particulars of Engagement and Discharge controls.").)

     Padilla argues that the shipping articles "have nothing to
do with overtime, and should not be used as a vehicle for
disenfranchisement of general maritime law rights." (Pl.'s Reply
1.)  Padilla also argues that Maersk has not shown the articles
are the product of "any negotiation or collective bargaining[;]"
rather, Padilla contends the articles merely reference the base
wage in fulfillment of statutory requirements. (Id. 2.)  The
Court agrees.  It appears that shipping articles do not have the
same import as a CBA.  Although intended to protect the rights
of seamen, shipping articles are statutorily required and,
unlike a CBA, do not constitute a union-negotiated package of
benefits.  The CBA in this case is quite expansive, covering the
terms and conditions of the seamen's employment, and, while
silent on the calculation of unearned wages, sets the rate at
which Maersk paid Padilla's maintenance.  In contrast, the
shipping articles here appear to function more like a roster of
crew members. See Blainey, 990 F.2d at 888.

     In addition, the wage rate in the shipping articles is
predicated upon the wage rate provided for in the CBA, which
Maersk concedes is silent on the calculation of unearned wages.

The Court thus presumes that unearned wages were not a topic of collective bargaining, and that the SIU did not negotiate a limitation on seamen's right to recover overtime pay as part of unearned wages in exchange for other benefits. See Marcic, 397 F.3d at 131. It is unclear, therefore, why the shipping articles would purport to set such a limit. And since seamen bargain most effectively as a group through their chosen union, see Ammar, 342 F.3d at 146, it would defeat the purpose of having a union-negotiated contract if its provisions could be modified or limited in an agreement between an individual seaman and his ship's master. (See O'Connell Decl. Ex. A. at 1 (stating in CBA that SIU is "the sole and exclusive bargaining representative of all Unlicensed Personnel employed on board American-flag vessels owned or operated by [each member Company of the American Maritime Association] or its subsidiaries.").)

Moreover, the Court discerns no limitation on unearned wages in the shipping articles. The $101.73 daily wage rate in the shipping articles appears in an upper section titled "Seaman's Identification and Acceptance of Employment" under the subheading "Seaman's Rate and Wage Information." (O'Connell Decl. Ex. B.) During the course of his employment aboard the Maersk Arkansa, Padilla earned daily wages at the rate indicated in the shipping articles, and overtime wages. (O'Connell Decl. Ex. C.) Below "Seaman's Identification and Acceptance of

27

Employment" is a section titled "Voyage Discharge/Release Information" that lists the seaman's "Regular Wages Earned" through discharge, applicable "Deductions," and "The Balance of Wages Paid at Discharge." (O'Connell Decl. Ex. B.)  This lower section of the shipping articles makes no reference to unearned wages owed to an incapacitated seaman. (Id.)  Thus, the section on "Wages" in the upper half of the shipping articles clearly refers to *earned* wages and does not purport to limit the measure of *unearned* wages.  Even if, at best, the articles were deemed ambiguous, they would be construed against the master and in favor of the seaman as a matter of law. See The Thomas Tracy, 24 F.2d at 374.  Thus, the shipping articles do not modify or limit Padilla's entitlement under general maritime law to overtime pay as part of his unearned wages.

C.  Determining the Amount of Unearned Overtime Wages

Maersk argues that because "overtime was not guaranteed or required on the Maersk Arkansas, [Padilla] cannot prove the amount of overtime he would have earned" and summary judgment must be denied. (Def.'s Mem. 3-4.)  However, Maersk's admission that it will include overtime in unearned wage calculations as an inducement for a seafarer to settle a Jones Act claim belies

its contention that an assessment of reasonably expected

overtime is too speculative to make on summary judgment.[15]

The Court finds that the amount of overtime is readily

ascertainable and appropriately resolved on summary judgment.

"Although the amount of recoverable damages is a question of

fact, the measure of damages upon which the factual computation

is based is a question of law." Oscar Gruss & Son, Inc. v.

Hollander, 337 F.3d 186, 196 (2d Cir. 2003) (McLaughlin, J.)

(internal quotation marks and citation omitted). Therefore, the

Court must first determine, as a matter of law, how to measure

damages. Padilla argues that either (i) his average amount of

overtime prior to injury or (ii) the amount of overtime pay his

replacement man actually received until the end of voyage would

be a proper measure of damages. The Court finds that Padilla's

average weekly amount of overtime aboard the Maersk Arkansas

prior to his injury is the proper measure of damages, since the

amount of overtime a seaman can earn aboard the Maersk Arkansas

is not predetermined under the CBA. Cf. Flores, 47 F.3d at 1127

---

[15] Maersk relies on two cases outside this Circuit for the proposition that overtime earnings are too uncertain for plaintiff to prove on summary judgment: Griffin v. Oceanic Contractors, Inc., 664 F.2d 36, 39-40 (5th Cir. 1981), rev'd on other grounds, 458 U.S. 564 (1982) (affirming district court's denial of plaintiff's request to include overtime as unearned wages because "[t]he actual amount of overtime was uncertain, and hence any inclusion of such would have been purely speculative"), and Keefe v. American Pac. S.S. Co., 110 F. Supp. 853, 856 (S.D. Cal. 1953) (finding plaintiff not entitled to overtime he would have earned had he actually gone on voyage because "[a]ctual earning of overtime was an event which might or might not occur"). The Court finds these cases unpersuasive because an assessment of overtime earnings in this case is not unduly speculative.

(finding that, since unearned tips were not predetermined and not paid by the employer, "the most principled way to calculate the tips [plaintiff] would have earned is to assume that [plaintiff]'s average weekly tips for the work he performed on each ship was the amount of tips he would have earned each week had he stayed on each ship").

Here, there is no genuine issue of fact as to the amount of overtime that Padilla performed prior to the onset of his injury. (See Pl.'s Mem. 8; O'Connell Decl. Ex. C.) There is also no factual dispute as to the date of Padilla's discharge and the date the Maersk Arkansas's voyage ended. (See Def.'s Opp'n 2; Berger Decl. ¶ 7; O'Connell Decl. Ex. B.) Therefore, there is no factual dispute as to the computation of damages in this case.

Padilla is entitled to recover the average weekly amount of three (3) hours of overtime each weekday and eleven (11) hours of overtime each weekend day and holiday at the applicable overtime rate of $21.06 per hour from the date after his discharge until the ship's voyage ended. For the period of November 7, 2006 until February 26, 2007, Padilla would have worked seventy-four (74) weekdays and thirty-eight (38) weekends/holidays but for his injury.[16] This calculates to 222

---

[16] Pursuant to Article II, Section 20, the Maersk Arkansas would have observed the following holidays: Veterans Day, Thanksgiving Day, Christmas, New

hours of weekday overtime and 418 hours of weekend/holiday overtime. At \$21.06 per hour, Padilla would have earned a total of \$13,478.40 in overtime pay but for his injury. (See Pl.'s Mem. Ex. 1b.)[17] As Maersk has already paid Padilla base wages for this period at the rate set forth in the CBA and shipping articles, Padilla is entitled to recover an additional \$13,478.40 as unearned wages.

## CONCLUSION

For the foregoing reasons, Padilla's motion for summary judgment is GRANTED. The parties are ordered to appear before this Court for a pre-trial conference in courtroom 18B on June 25, 2009 at 10:00 a.m.

**SO ORDERED.**

**New York, New York**

March **11** , 2009

U.S.D.J.

---

Year's Day, Martin Luther King, Jr. Birthday, and President's Day. (O'Connell Decl. Ex. A. at 8.)

[17] Inexplicably, plaintiff's moving brief sets forth a calculation of average overtime pay inconsistent with the Court's assessment and with the amount that plaintiff initially requested from Maersk pursuant to a March 28, 2007 letter. (Compare Pl.'s Mem. 8-9 with Pl.'s Mem. Ex. 1b.) Although the Court's calculation of the number of weekdays, weekend days, and holidays during the relevant period, and average overtime for that period, differs from that set forth in plaintiff's moving brief, the Court can discern no reason other than clerical error on the part of plaintiff's counsel for this discrepancy. In addition, the Court notes that the amount calculated by the Court is within the amount of overtime paid to the replacement Chief Cook for the same period of time. (See Pl.'s Reply Ex.)